UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT HEBRON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 14-cv-8155 |
| | ) | |
| DIRECTV, LLC.; MULTIBAND CORP.; | ) | Judge John W. Darrah |
| and DIRECTSAT USA, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

On March 24, 2015, Plaintiffs filed a First Amended Complaint ("FAC") against

Defendants DIRECTV, LLC; Multiband Corp.; and DirectSat USA, LLC., (hereinafter,

"Defendants")[1]. The FAC alleged violations of the Fair Labor Standards Act of 1938 (the

"FLSA"), 29 U.S.C. § 201, *et seq.*; the Illinois Minimum Wage Law; the Illinois Wage Payment

and Collection Act; and the Illinois Employee Classification Act. Defendants filed Motions to

Dismiss [62, 76], pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a

claim for which relief can be granted. On October 13, 2015, this Court granted Defendants'

Motion to Dismiss in part, and denied in part. On November 12, 2015, Plaintiffs filed a Second

Amended Complaint ("SAC") against Defendants. The SAC alleges one count under the FLSA,

alleging minimum wage and overtime wage violations.[2] Defendants have filed Motions to

---

[1] Plaintiffs Robert Hebron, Larry Blanchard, and Brenty Yancey bring their claims solely against DIRECTV. Plaintiffs David Kauchak, Lonny Sampson, and Richard Stroening bring their claims against DIRECTV and DirectSat. Plaintiffs Arlandis Bradford, Anthony Harris, and Rodney Meeley were W-2 technicians of DirectSat and bring claims against DIRECTV and DirectSat. Plaintiff Terry Weatherman was a W-2 technician of Multiband and brings his claims against DIRECTV and Multiband.

[2] Plaintiffs make several references to minimum wage violations as well as overtime violations but make no request for unpaid minimum wages in their request for relief.

Dismiss [112, 116] pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6). For the reasons discussed below, Defendants' Motions to Dismiss [112, 116] are granted in part and denied in part.

## BACKGROUND

DIRECTV is a Delaware corporation with its principal place of business in El Segundo, California. (SAC ¶ 16.) Multiband Corp. is a Minnesota corporation, with its principal place of business in New Hope, Minnesota. (*Id.* at ¶ 17.) DirectSat is a Delaware limited liability company with its principal place of business in King of Prussia, Pennsylvania. (*Id.* at ¶ 18.) Robert Hebron is an individual residing in Missouri. (*Id.* at ¶ 6.) The remaining Plaintiffs are individuals residing in Illinois. (*Id. at ¶¶* 7-15.) Plaintiffs worked as satellite television installation technicians whose principal duty was to install and repair DIRECTV satellite television service. (*Id.* at ¶ 22.)

DIRECTV controls and manages their service technicians by either employing them directly ("W-2 Employees") or through an employment network of service providers (the "Provider Network") consisting of Home Service Providers ("HSPs"), including DirectSat, Secondary Services Providers ("Secondary Providers"), subcontractors, and service technicians. (*Id.* at ¶ 23.) DIRECTV was the primary client of the HSPs and Secondary Providers and was the source of substantially all of their income. (*Id.* at ¶ 26.) DIRECTV gives Providers advance payments in order to keep Providers afloat. (*Id.* at ¶ 48.) DIRECTV has absorbed several Providers through acquisition. (*Id.* at ¶ 49.) Currently, there are only three independent HSPs in operation, including DirectSat. (*Id.*)

DIRECTV controls the Provider Network through contracts with HSPs and Secondary Providers; the HSPs and Secondary Providers then enter into contracts with largely captive entities that DIRECTV refers to as subcontractors; and those subcontractors then enter into contracts with the technicians who install the satellite television equipment. (*Id.* at ¶ 28.) In some cases, the HSPs and Secondary Providers contract directly with technicians. (*Id.*). DirectSat passed along scheduling from DIRECTV and provided supervision of some technicians. (*Id.* at ¶ 30.) DirectSat maintained a contractor file for each technician working for them. (*Id.* at ¶ 31.) The files were regulated and audited by DIRECTV. (*Id.*) The technicians were called 1099 technicians or independent contractors. (*Id.*) DirectSat had the ability to enter into and terminate contracts with the 1099 technicians. (*Id.* at ¶ 33.) DirectSat also maintained warehouses where 1099 technicians had to pick up some equipment and take some training. (*Id.* at ¶ 34.)

Technicians installed DIRECTV's satellite television equipment according to the same policies, procedures, practices, and performance standards required by DIRECTV. (*Id.* at ¶ 36.) DIRECTV uses Provider Agreements to ensure that technicians perform their work as specified, and Subcontractor Agreements and Technician Agreements incorporate the provisions of the Provider Agreements. (*Id.* at ¶ 38.) The Provider Agreements control almost all facets of the technicians' work. (*Id.* at ¶ 39.) Each technician is assigned a work order through a centralized computer software system that DIRECTV controls. (*Id.* at ¶ 40.) DIRECTV mandates certain methods and standards of installation. (*Id.* at ¶37.) Because of this, each technician's job duties are virtually identical. (*Id.*) DIRECTV used a database program known as SIEBEL to coordinate the assignment of work orders to technicians using a unique "Tech ID Number" for

each technician. (*Id.* at ¶42.) Upon arriving at each work site, technicians were required to check-in with DIRECTV. (*Id.* at ¶ 44.) After an assigned job, technicians were required to report to DIRECTV that the installation was complete. (*Id.*) Through the SIEBEL system, DIRECTV and the Providers control the details of Plaintiffs' day-to-day work and compensation. (*Id.* at ¶ 65.)

Plaintiffs were required to purchase and wear uniforms with DIRECTV insignia on them and to display DIRECTV insignia on vehicles driven to customers' homes. (*Id. at* ¶ 39.) Plaintiffs were also made to hold themselves out as agents of DIRECTV. (*Id.* at ¶ 86.) DIRECTV also requires that all technicians pass pre-screening and background checks and obtain a certification from the Satellite Broadcasting & Communications Association before they could be assigned work orders. (*Id.* at ¶ 76.) Independent Contractor Plaintiffs were also required to purchase supplies necessary to perform installations and required to provide all maintenance and purchase all gas for the vehicles they drove between customers' homes. (*Id.* at ¶ 113.)

Plaintiffs were compensated on a piece-rate payment scheme that is utilized throughout DIRECTV's network. (*Id.* at ¶ 102.) Under the piece-rate system, technicians are paid on a per-task basis for certain enumerated "productive" tasks. (*Id.* at ¶ 107.) Plaintiffs were not compensated for assembling satellite dishes, transportation to and from assignments, reviewing and receiving schedules, contacting customers to confirm installations, obtaining required supplies, assisting other technicians, performing required customer education, contacting DIRECTV to report in or activate service, working on installations that were not completed, and working on installations where Plaintiffs had to return and perform additional work on

previously completed installations ("chargebacks").  (*Id.* at ¶¶ 108-112)  There was no contract, memorandum, or other document between Plaintiffs and Defendants, memorializing or explaining the pay system.  (*Id.* at ¶ 105.)

DIRECTV and Providers' quality-control personnel reviewed Plaintiffs' work and imposed "chargebacks" and/or "rollbacks" based on those reviews.  (*Id.* at ¶ 112.)  Chargebacks were deductions from technicians' pay if there were issues with an installation or questions from a customer.  (*Id.*)  Some issues included:  faulty equipment, improper installation, customer calls on how to operate their remote control, and customers' failure to give greater than a ninety-five percent satisfaction rating for the services provided.  (*Id.*)

Plaintiffs allege that they were routinely required to work more than forty hours per week, while being denied overtime pay and being subjected to an effective wage rate below that required by law.  (*Id.* at ¶ 115-116.)

## LEGAL STANDARD

To properly state a claim, the plaintiff must present "a short and plain statement of the claim showing that the pleader is entitled to relief; and . . . a demand for the relief sought . . . ."  Fed. R. Civ. P. 8.  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me-accusation."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In order to withstand a 12(b)(6) motion, a plaintiff must plead sufficient factual matter to state a claim for relief that is "plausible on its face."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570).  "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations."  *Iqbal*, at 1939.  Plaintiffs are not required to "plead the

elements of a cause of action along with facts supporting each element." *Runnion ex rel.*

*Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 517 (7th Cir. 2015).

The complaint must provide a defendant "with 'fair notice' of the claim and its basis." *Tamayo*

*v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and

*Twombly*, at 544-555). Under Rule 12(b)(6), the court accepts the complaint's well-pleaded

factual allegations as true, and all reasonable inferences are construed in the plaintiff's favor.

*Twombly*, at 555-56.

## ANALYSIS

### *FLSA*

Plaintiffs allege that Defendants violated the FLSA by failing to pay overtime wages and

failing to pay minimum wage. Defendants argue that Plaintiffs have not shown that an

employer-employee relationship existed for the purposes of the FLSA. Employer is defined as

including "any person acting directly or indirectly in the interest of an employer in relation to an

employee . . . ." 29 U.S.C. § 203(d). The "FLSA contemplates several simultaneous employers

who may be responsible for compliance with the FLSA." *Villareal v. El Chile, Inc.*, 776 F.

Supp. 2d 778, 784 (N.D. Ill. 2011) (citing *Falk v. Brennan*, 414 U.S. 190, 191 (1973)). "Two or

more employers may jointly employ someone for the purpose of the FLSA." *Karr v.*

*Strong Detective Agency, Inc.*, 787 F.2d 1205, 1207 (7th Circ. 1986); *see also* 29 C.F.R. § 791.2.

For a joint-employer relationship to exist, each alleged employer must exercise control over the

working conditions of the employee. *See Moldenhauer v. Tazewell-Pekin Consol.*

*Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008) (quoting *Moreau v. Air France*, 343 F.3d

1179, 1182 (9th Cir. 2003)).

Under the Department of Labor's regulations:

> Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as: (1) where there is an arrangement between the employers to share the employee's services, such as to interchange employees; or (2) where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or (3) where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b); *see also Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 608 (7th Cir. 2014).

Courts look at several factors to determine whether an entity is a joint employer, including whether the alleged employer: "(1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payments, (3) determined the rate and method of payment, and (4) maintained employment records." *Moldenhauer*, 536 F.3d at 644. The FLSA "has been construed liberally to apply to the furthest reaches consistent with congressional direction." *Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 2011 (1959). "A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case." 29 C.F.R. § 791.2(a). The economic reality of the situation controls whether the FLSA applies. *See Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961).

<u>Power to Hire and Fire Employees</u>

Defendants contend that Plaintiffs have not sufficiently alleged Defendants had the power to hire or fire them.  Plaintiffs allege Defendants authorized subcontracting principals to hire Plainitffs to perform DIRECTV work only if they met DIRECTV's non-discretionary pre-hire conditions, including that Plaintiffs:  (1) complete DIRECTV's New Hire training and the Satellite Broadcasting & Communications Association Certified Installer Training, (2) pass a criminal background check, and (3) pass a nine-panel drug screen.  (SAC ¶ 76.)  But Plaintiffs concede that DIRECTV and the HSP Defendants did not accept applications or interview potential candidates.  Plaintiffs contend Defendants nonetheless determined who could and could not be hired to install DIRECTV systems.  (*Id.* ¶¶ 74-76.)  Plaintiffs also allege Defendants retained the ultimate and unilateral authority to terminate their employment by de-authorizing their technician ID number and prohibiting Plaintiffs from continuing to receive work orders. (*Id.* ¶¶ 70, 77-78.)

As pled, DIRECTV "unquestionably plays a role in hiring and firing technicians." *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 689 (D. Md. 2010).  DIRECTV does set some standards for the hiring of technicians and maintains and distributes lists of poorly performing technicians.  (SAC, ¶¶ 82-83).  Plaintiffs also allege that DirectSat and Multiband had the power to enter into and terminate contracts with technicians.  (*Id.* ¶ 33.)  Plaintiffs have sufficiently pled that Defendants had influence over the hiring and/or firing process.

<u>Supervision and Control</u>

Defendants argue that Plaintiffs' assertions that DIRECTV "directly and indirectly" supervised their "work schedules and conditions of employment" are insufficient to establish a

8

joint-employer relationship.  Plaintiffs allege Defendants retained authority to control and did control all meaningful conditions of Plaintiffs' employment.  Specifically, DIRECTV promulgated mandatory rules, policies, and practices regarding the manner and method by which installations were to be performed.  (*Id.* ¶¶ 35-37, 87.)  DIRECTV contractually obligated DirectSat and Multiband to hand down these rules and policies to all technicians.  (*Id.* at ¶ 38.)  DIRECTV developed and provided mandatory training, which it required of all technicians, including Plaintiffs.  (*Id.* at ¶¶ 42, 84.)

DIRECTV maintained an online scheduling and management system to schedule, track, and manage all DIRECTV installation work performed by Plaintiffs.  (*Id.* ¶¶ 42, 84.)  DIRECTV created daily work orders and assigned them to Plaintiffs.  (*Id.* ¶ 42.)  Furthermore, DIRECTV required all technicians, including Plaintiffs, to wear DIRECTV uniforms, drive the DIRECTV-branded vehicles and display DIRECTV-marked credentials.  (*Id.* ¶ 45.)  Plaintiffs also allege Defendants supervised and controlled them through personnel monitoring and post-installation customer surveys.  (*Id.* ¶¶ 44, 82, 84.)  DirectSat and DIRECTV personnel conducted on-site inspections and audits of the technical proficiency of Plaintiffs' work.  (*Id.* ¶ 80.)  Defendants measured Plaintiffs' work performance against metrics they developed, circulated reports identifying low-performing technicians, and demanded improvement from bottom performing technicians.  (*Id.* ¶¶ 82-83.)

Defendants argue that these requirements are "quality assurance measures."  (Dkt. 113 at 14.)  "[D]etailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship."  *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 690

(D. Md. 2010).  However, the conduct Plaintiffs allege goes beyond quality control.  Plaintiffs allege that they were given work orders by Defendants, who then monitored and tracked Plaintiffs and evaluated that work.  Plaintiffs have plausibly alleged control and supervision by Defendants.

<u>Rate and Method of Payment</u>

Plaintiffs admit that Defendants did not pay the Plaintiffs but argue that the compensation method was set by and ultimately funded by DIRECTV.  There are no specific allegations that DIRECTV or DirectSat set Plaintiffs' rate and method of payment.  Rather Plaintiffs allege that DIRECTV "sets an amount it is willing to pay for certain defined tasks."  (SAC ¶ 91.)  These allegations remain substantively unchanged from the FAC.  While DIRECTV determined what tasks were compensable and what tasks were not, there is no allegation that they determined the rate for compensation.  Further, Plaintiffs admit that Providers, and not DIRECTV, paid Plaintiffs using their own payroll and paycheck systems.  Plaintiffs have not sufficiently alleged that DIRECTV and DirectSat determined the rate and method of payment.

<u>Employment Records</u>

Plaintiffs admit that DIRECTV does not keep employment-related records.  (*Id.* ¶ 96.)  DIRECTV does require HSPs to retain paperwork on technicians, which is subject to inspection by DIRECTV.  (*Id.*)  DIRECTV assigned Plaintiffs and all other subcontractor technicians a unique identification number.  (*Id.* ¶¶ 42-43.)  DirectSat and Multiband maintained records for their own W-2 technicians, including Plaintiffs Anthony Harris, Rodney Meeley, and Terry Weatherman.  (*Id.* ¶ 32.)  Through the SIEBEL system, DIRECTV maintained records of the work orders completed by Plaintiffs, as well as Plaintiffs' work schedules, and metrics that track

Plaintiffs' work performance. (*Id.* ¶ 82-84.) Plaintiffs have sufficiently alleged that DirectSat and Multiband kept records on their W-2 employees but have not sufficiently alleged that any Defendant kept records for non-W-2 employees.

*Joint Employer*

Plaintiffs have alleged that Defendants had some control over hiring and firing and exerted substantial control and supervision over Plaintiffs' work schedules and conditions of employment. Taking all well-pleaded factual allegations as true, making all reasonable inferences in Plaintiffs' favor, and considering the liberal scope of the FLSA, Plaintiffs have plausibly alleged that Defendants were joint employers for the purposes of the FLSA.

*Limitations Period*

Defendants incorporate their previous arguments, from the first Motions to Dismiss, regarding the limitations period. Defendants argue that Plaintiffs fail to state a claim under the FLSA for recovery beyond a two-year period. "[E]xcept for cases of willful violations, claims under the FLSA must be brought within two years of the violation." *Bankston v. State of Ill.*, 60 F.3d 1249, 1253 (7th Cir. 1995). In contrast, "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). Willful violations are those where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). "[A]n employer's mere negligence or a good faith − but incorrect − belief that they were in compliance with the FLSA, are not sufficient to rise to the level of a willful violation." *Difilippo v. Barclays Capital, Inc.*, 552 F. Supp. 2d 417, 425 (S.D.N.Y. 2008).

11

Defendants claim that Plaintiffs have not sufficiently alleged willfulness to allow for a three-year limitations period. Plaintiffs have alleged that "Defendants' unlawful conduct was willful because . . . DIRECTV and other members of the Provider Network knew, or should have known, that the fissured employment scheme utilized a piece-rate system(s) that unlawfully denied Plaintiffs minimum wage, overtime wage, and other employment benefits." (SAC ¶ 193.) Plaintiffs have sufficiently alleged willfulness to extend the limitations period to three years.

*Overtime*

Defendants incorporate their previous arguments, from the first Motions to Dismiss, regarding overtime wages. "Under the FLSA, a nonexempt employee who works more than forty hours in a given week must be compensated for those excess hours." *Caraballo v. City of Chicago*, 969 F. Supp. 2d 1008, 1014 (N.D. Ill. 2013) (citing 29 U.S.C. § 207(a)(1)). As several appellate courts have found, Plaintiffs' allegations that they typically worked for more than forty hours a week and were not compensated for all time worked is sufficient to withstand a motion to dismiss. *See Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 243 (3d Cir. 2014) ("a plaintiff's claim that she 'typically' worked forty hours per week, worked extra hours during such a forty-hour week, and was not compensated for extra hours beyond forty hours he or she worked during one or more of those forty-hour weeks, would suffice."); *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) (". . . in order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours."); *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 645 (9th Cir. 2014) ("A plaintiff may establish a plausible claim by estimating the length of her average workweek during the applicable period

and the average rate at which she was paid, the amount of overtime wages she believes she is owed, or any other facts that will permit the court to find plausibility."). Plaintiffs have sufficiently alleged that they worked in excess of forty hours a week without being fully compensated.

### Minimum Wage

Plaintiffs make references to the failure to pay the minimum wage under the FLSA. (SAC ¶¶ 189-195.) The FLSA requires employers to pay their employees a minimum wage, unless those employees fall into certain exempted categories. 29 U.S.C. § 206(a) (2010). "Employee repayment and reimbursement provisions do not violate the FLSA provided the employee's effective wages remain above the minimum wage level." *Franks v. MKM Oil, Inc.*, No. 10-CV-13, 2010 WL 3613983, at *4 (N.D. Ill. Sept. 8, 2010) (citing *Heder v. City of Two Rivers, Wisc.*, 295 F.3d 777, 782 (7th Cir. 2002)). However, Plaintiffs still have not adequately pled any facts demonstrating that these factors ever caused them to earn less than the minimum wage in any given workweek. Plaintiffs merely assert that Defendants' practices caused their hourly wage to fall below the minimum. But, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. Therefore, to the extent that the SAC makes claims for minimum wage violations, the Motions to Dismiss are granted without prejudice.

### Rule 8

Defendants also ask that the Complaint be dismissed due to violations of Federal Rule of Civil Procedure 8. Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "each allegation shall be simple, concise, and direct."

13

Fed.R.Civ.P. 8(a)(2), (d)(1). Defendants argue that the Complaint unnecessarily includes multiple references to legal authority, as well as several footnotes of legal citation. Defendants also argue that the Complaint is, at times, contradictory. This may be true; however, "when the complaint adequately performs the notice function prescribed for complaints by the civil rules, the presence of extraneous matter does not warrant dismissal." *Davis v. Ruby Foods, Inc.*, 269 F.3d 818, 820-21 (7th Cir. 2001). The Complaint adequately performs the notice function; and, therefore, the presence of extraneous material does not warrant dismissal.

## CONCLUSION

For the reasons set forth above, Defendants' Rule 12(b)(6) Motions to Dismiss [112, 116] are granted in part and denied in part. To the extent that Plaintiffs allege overtime claims, the Motions to Dismiss are denied. To the extent that Plaintiffs allege minimum wage claims, the Motions to Dismiss are granted without prejudice, and Plaintiffs are given leave to amend, pursuant to Federal Rule of Civil Procedure 11, within twenty-eight days of the entry of this Order. Defendants' Motions to Dismiss pursuant to Rule 8 are denied.

Date: _____ April 7, 2016 _____      _____

JOHN W. DARRAH
United States District Court Judge

14